UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MELISSA WARMING, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 08-373-P-S |
| | ) | |
| THE HARTFORD LIFE & ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM DECISION AND ORDER ON
PLAINTIFF'S MOTION TO SUPPLEMENT RECORD

In this action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover long-term disability ("LTD") benefits allegedly wrongfully discontinued, the plaintiff seeks to supplement the administrative record by adding four of several exhibits appended to her complaint.  *See* Plaintiff's Motion To Supplement Record ("Motion") (Docket No. 18) at 1-2; Exhs. 10, 13-15 to Verified Complaint ("Complaint") (Docket No. 1).

As to two of those exhibits, Exhs. 10 and 15, the motion is moot.  Exhibit 15 already is of record, *compare* Administrative Record ("Record"), filed by defendant on June 10, 2009, Vol. I at 41 *with* Exh. 15 to Complaint, as is the substance of Exhibit 10, *compare* Record, Vol. I at 6 (defendant's notation that it faxed a copy of the plaintiff's job description to the plaintiff's attorney on March 20, 2008); Vol. III at 614-15 (job description) *with* Exh. 10 (fax cover sheet from defendant to plaintiff's attorney dated March 20, 2008, together with job description).

For the reasons that follow, as to the remaining exhibits, Exhibits 13 and 14, the motion is denied.

1

## I.  Applicable Legal Standards

The First Circuit has held that in an ERISA case such as this one, in which a *de novo* standard of review applies, "[t]he decision to which judicial review is addressed is the final ERISA administrative decision."  *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 519 (1st Cir. 2005).  The court has reasoned:

> It would offend interests in finality and exhaustion of administrative procedures required by ERISA to shift the focus from that decision to a moving target by presenting extra-administrative record evidence going to the substance of the decision.
>
> ***
>
> Furthermore, the final administrative decision acts as a temporal cut off point. The claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the administrative decision.

*Id*.  Nonetheless, the court has acknowledged:

> There may be times when it is appropriate for courts to hear new evidence. Where the challenge is not to the merits of the decision to deny benefits, but to the procedure used to reach the decision, outside evidence may be of relevance.  For example, evidence outside the administrative record might be relevant to a claim of personal bias by a plan administrator or of prejudicial procedural irregularity in the ERISA administrative review procedure.  We need not catalogue the situations in which new evidence is admissible, other than to note it is more obviously relevant when the attack is on the *process* of decision making as being contrary to the statute than on the substance of the administrator's decision.  Also, evidence may be relevant to explain a key item, such as the duties of the claimant's position, if that was omitted from the administrative record.

*Id*. at 520 (citation omitted) (emphasis in original).

The plaintiff contends that her extra-record evidence is offered in support, *inter alia*, of a procedural challenge: her allegation that the defendant denied her the right to "full and fair review" codified at 29 C.F.R. § 2560.503-1(h).  *See* Motion at 7-8.  That regulation provides, in relevant part:

(1)   In general.   Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.

(2)   Full and fair review. . . .   [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures –

\*\*\*

(iii)   Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. . . .

(iv)   Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(1), (2)(iii)-(iv).[1]

A plaintiff must make a showing of prejudicial procedural irregularity to warrant reversal on the ground of denial of the right to full and fair review.  *See, e.g., DiGregorio*, 423 F.3d at 15-16.

## II.  Factual Background

The plaintiff, formerly a secretary/stenographer for the Muscular Dystrophy Association, filed a claim for LTD benefits predicated on her diagnosed multiple sclerosis in September 1998. *See* Record, Vol. III at 614-15.  To qualify for benefits pursuant to her employer's LTD plan, she had to demonstrate, *inter alia*, that injury or sickness rendered her "continuously unable to

_____

[1] The plaintiff's claim, which was made in 1998, *see* Record, Vol. III at 614-15, is governed by an earlier version of this regulation.   *See* Defendant's Objection to Plaintiff's Motion To Supplement the Administrative Record ("Objection") (Docket No. 20) at 16-17; Plaintiff's Reply to Defendant's Opposition to Motion To Supplement Administrative Record ("Reply") (Docket No. 23) at 7 & n.8.  The regulation, which was promulgated in 1977, was amended in 2000 with respect to claims filed on or after January 1, 2002.   *See DiGregorio v. Hartford Comprehensive Employee Benefit Serv. Co.*, 423 F.3d 6, 14 n.4 (1st Cir. 2005); 29 C.F.R. § 2560.503-1(o)(1). Nonetheless, the plaintiff herself quotes the current version of the regulation, *see* Motion at 7, and nothing turns on the differences between the pre-2002 version and the current one.

perform the substantial and material duties of [her] regular occupation[.]" *Id.*, Vol. I at 71.[2]  Her

claim form listed her job duties as "[t]yping, secretarial, steno and general office skills[.]" *Id.*,

Vol. III at 614.  Her treating physician, T. Edward Collins, D.O., of Maine Neurology, P.A.,

described her subjective symptoms as fatigue, muscle weakness, and visual disturbance, and his

objective findings as abnormal MRI scans consistent with multiple sclerosis. *See id.* at 617.  Her

application was approved. *See id.* at 741.

District the period that the plaintiff received LTD benefits, she and Dr. Collins regularly

completed paperwork updating plan administrators as to her status. *See, e.g., id.*, Vol. II, at 444-

45, 448-51, 456-58, 463-65, 531-33.  In July 2005, the plaintiff completed a supplemental

questionnaire in which she claimed that her fatigue and vertigo were more severe and that she

needed help with housework. *See id.*, Vol. I at 23-24.  On December 12, 2005, during the course

of a file review, claims staff noted inconsistencies between the plaintiff's statements and those of

Dr. Collins, for example, that in 2003 Dr. Collins reported that the plaintiff's symptoms included

poor memory and cognitive slowness, yet she reported only dizziness as a change in her

condition and stated in 2005 that she did not suffer a severe cognitive impairment. *See id.* at

177.

The defendant hired private claim investigators to conduct surveillance of the plaintiff,

which was accomplished on December 15 and 22, 2005. *See id.* at 212.  Investigators reported

that the plaintiff was active on both days, walked unaided with no visible limp, operated her

vehicle with no apparent difficulty, unloaded her grocery cart with no obvious difficulty in lifting

gallons of milk, bags, and six-packs of soda, went shopping with a friend at Maine Mall on the

---

[2] The plan in question was underwritten by Continental Casualty Company.  *See* Record, Vol. I at 51, 69.  It previously was administered by CNA Group Benefits, but now is administered by the defendant. *See id.; see also id.,* Vol. III at 888; Motion at 2; Objection at 2.

second day of surveillance, and remained inside the mall for more than an hour.  *See id*. Investigators provided a surveillance videotape.  *See id*. at 214.

The defendant tasked an in-house investigator to arrange for an interview of the plaintiff at her home.  *See id*. at 182.  That interview took place on March 10, 2006.  *See id*.  The investigator noted that he observed the plaintiff walk without any noticeable restrictions or limitations.  *See id*. at 184.  He also stated that he saw her bend at the waist while in her driveway and squat down in the kitchen to retrieve an item from a lower cabinet, although she did hold onto the kitchen counter while doing so.  *See id*.  He noted that during the interview, she spent most of her time sitting in a kitchen chair, taking no rest breaks.  *See id*.  When he asked about pain, she stated that she had none.  *See id*.  However, she did tell him at the conclusion of the interview that she was fatigued and intended to go to her room and take a nap as soon as he left. *See id*.

The interviewer also reported that the plaintiff was able to understand his questions and provide cogent responses to them, that her responses were well-articulated, that she remained on point when responding to questions, and that she answered all questions without hesitation.  *See id*.  He noted that she remained alert and lucid throughout the interview and neither complained of an inability to concentrate nor displayed confusion or a lack of focus in his presence.  *See id*. However, she did tell him that she experienced issues with concentration and focus during periods of high stress and fatigue.  *See id*.

The interviewer found the plaintiff's description of her functioning fairly consistent with that observed during surveillance.  *See id*. at 183-84.[3]  He prepared a Continuing Disability Statement for her signature, which she signed on March 14, 2006, making one correction.  *See*

_____

[3] The plaintiff apparently was unaware during her March 10, 2006, interview that she had been the subject of surveillance in December 2005.  She was notified by letter dated April 25, 2006, that she had been the subject of video surveillance.  *See* Record, Vol. II at 376.

*id*. at 185 & Vol. III at 730-38.  She stated that her symptoms included extreme fatigue and a periodic burning numbness in her feet and hands.  *See id*. at 731.  She reported that she was able to (i) walk for about 30 minutes, after which she had to go home to go to bed or rest because of fatigue, (ii) stand without much problem, (iii) lift and carry items weighing up to 16 pounds, (iv) bend and twist at the waist without restriction, (v) squat and kneel if she had something to hold on to, (vi) push and pull, (vii) reach, (viii) walk up and down stairs, (ix) keep her balance most of the time, and (x) sit without restriction.  *See id*. at 732-34.  She reported that she was not able to concentrate very well, assumedly because of her multiple sclerosis.  *See id*. at 734.  She stated that she was prevented from returning to her own occupation mainly by fatigue and secondarily by intermittent numbness and burning in her feet and hands and that she could not complete a full work day or handle the stress of her former job.  *See id*. at 737.

On or about April 24, 2006, the defendant sent Dr. Collins a statement summarizing the contents of its interview with and surveillance of the plaintiff.  *See id*., Vol. II at 363.[4]  The defendant stated:

> [U]nless you provide restrictions or limitations otherwise, as of today our assessment in function will conclude that Ms. Warming is capable of performing in a full-time seated-type function, which will require only intermittent or occasional periods of walking/standing and[] allows for full use of the upper extremities, such as with fingering and handling and typing.  Lifting/carrying will be limited to 0-10 pounds on no more than an occasional basis.  Sitting for the majority of the workday will be allowed and she will have the opportunity to change body positions/postures as needed for comfort (by walking, standing, or moving about).

---

[4] The defendant indicated that it had enclosed a copy of its narrative of the surveillance results and offered to provide Dr. Collins a copy of the surveillance CD upon request.  *See* Records, Vol. II, at 363.  It also offered Dr. Collins a copy of the complete in-person interview of the plaintiff.  *See id*., Vol. I at 57; *see also id*., Vol. II, at 363 (directing Dr. Collins to "see entire interview").

*Id*. (boldface omitted).   The defendant queried, "To the above assessment, do you have any changes or additional limitations/restrictions?"   *Id*.   Dr. Collins checked a box indicating, "No," and returned the form, dated May 22, 2006, to the defendant.   *See id*.

By letter dated June 19, 2006, the defendant informed the plaintiff that it was terminating her LTD benefits effective as of that date because she no longer satisfied the policy's definition of disability.   *See id*., Vol. I at 54-59.   After detailing the evidence reviewed, the defendant stated:

> We have concluded that the information obtained in the course of our investigation indicates that you would not be considered prevented from performing at the functional level required in your occupation.  This is as your treating physician did not offer any additional limitations in reply to our assessment and you have reported a high level of function, which is equal to or greater than the functional level required by your occupation.

*Id*. at 58.

The defendant advised the plaintiff that she had a right pursuant to ERISA to appeal the decision and receive a full and fair review.   *See id*.[5]   It advised her that she was entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to her claim and that she had 180 days from the date of her receipt of the letter to seek an appeal.   *See id*.   It noted that any appeal letter should clearly state her position, and that she could submit written comments, documents, records, and other claim-related information therewith.   *See id*.   It advised that, upon receiving her appeal, it would again review her entire claim, including any additional information submitted, and advise her of its determination.   *See id*.   It explained that if it denied her appeal, she would have the right to bring a civil action.   *See id*.

---

[5] The insurance policy governing the plaintiff's LTD benefits sets forth no procedures for terminating benefits or appealing such terminations.  *See* Record, Vol. I at 69-87.

On or about July 28, 2006, at the plaintiff's request, the defendant forwarded a copy of her entire claims file to her. *See id*. at 15. By letter dated November 20, 2006, attorney Jonathan Beal informed the defendant that he had been retained to assist with the plaintiff's appeal. *See id*. at 325. He requested a 45-day extension of the appeal deadline, *see id*., which the defendant granted, *see id*. at 13. Beal submitted an appeal letter dated February 1, 2007, enclosing a December 12, 2006, letter of Dr. Collins clarifying his position as to the plaintiff's disability. *See id*. at 279-85.

Dr. Collins stated that he understood the defendant's April 24, 2006, letter to indicate that the plaintiff had agreed that she had all of the work capacity set forth in that letter. *See id*. at 284. He indicated that he had read her Continuing Disability Statement, that her description in that statement of her fatigue, inability to sleep, burning pain and numbness, dizziness, and difficulty concentrating were completely consistent with her clinical condition, and that he had no doubt that she suffered those symptoms. *See id*. at 285. He stated that, based upon her Continuing Disability Statement, his long treatment of her multiple sclerosis, and his understanding of the requirements of an office or other workplace, it was clear to him that she continued to be totally disabled from any form of employment on a full-time or even regular part-time basis. *See id*. He concluded: "Her extreme fatigue, exhaustion, inability to sleep, dizziness, burning and numbness, and difficulty concentrating would make her unable to reliably perform or even attend any job in the competitive market." *Id*.

By letter dated February 5, 2007, the defendant informed Beal that it had received his appeal, that ERISA allowed 45 days to respond to the request, that he would be informed of any delay, and that its decision would in any event issue within 90 days of receipt of the request for review. *See id*. at 51. On March 2, 2007, at the defendant's request, Beal forwarded all MRI and

diagnostic reports concerning the plaintiff's multiple sclerosis. *See id*. at 112. By letter dated March 9, 2007, the defendant informed Dr. Collins that a physician from MES Solutions would contact him for clarification of the plaintiff's medical condition and functional status. *See id*. at 50. By letter dated March 21, 2007, the defendant advised Beal that it would not complete its review within 45 days because it had determined that a comprehensive medical review of all information in the plaintiff's claims file was necessary. *See id*. at 115. It advised Beal that the medical evidence would be reviewed by a medical consultant from MES Solutions and that it anticipated rendering a decision within 45 days. *See id*.

On April 2, 2007, Bruce R. Leforce, M.D., of MES Solutions spoke with Dr. Collins. *See id*. at 108. Dr. Leforce, who is board certified in neurology and has a sub-specialty certificate in clinical neurophysiology, *see id*. at 109, prepared a Peer Review Report dated April 5, 2007, in which he noted that he had reviewed all medical records provided by the defendant, including the plaintiff's most recent self-reported statements of functionality, and had spoken with Dr. Collins, *see id*. at 108. With respect to his conversation with Dr. Collins, he wrote:

> Dr. Collins indicates that the claimant states that she is unable to work because of fatigue and cognitive difficulties. She clearly has some impairment on the basis of her multiple sclerosis. He is not sure if she would be able to function in the work place because of her complaints. She has not had formal neuropsychological testing of her cognitive complaints. Dr. Collins indicates that he could arrange for this if needed for a return to work.

*Id*. Dr. Leforce concluded:

> Based on review of all the evidence provided, including the conversation with Dr. Collins and the video surveillance, no functional impairment, from a physical or cognitive standpoint is supported that would have precluded the claimant from performing at least full-time sedentary work as of 06/19/06 and beyond.
>
> She has impairment on the basis of her diagnosis of multiple sclerosis and her findings of spasticity and imbalance. However, she remains ambulatory and is able to drive her car. She is noted on surveillance to drive, shop, and to load items into her vehicle. She is observed to have the physical capacity to function

9

in a sedentary level job.  She can sit for up to eight hours per day and she can stand and walk occasionally.  She can lift and carry up to ten pounds occasionally.  She can exert a negligible amount of force continuously.  There is no objective evaluation of her cognitive status to suggest that she is not capable of performing a sedentary job from a cognitive standpoint.

*Id*. at 108-09.

By letter dated April 10, 2007, the defendant denied the plaintiff's appeal.  *See id*. at 45-48.  The defendant stated, in relevant part:

. . .  Dr. Collins indicated to Dr. Leforce during their conversation that Ms. Warming has indicated to him that she is unable to work because of fatigue and cognitive difficulties, and that she clearly has some impairment on the basis of multiple sclerosis; however, Dr. Collins indicated that he was not sure if Ms. Warming would be able to function in the work place because of her complaints. Dr. Collins indicated that Ms. Warming has not had a formal neuropsychological testing of her cognitive complaints.

. . .  [T]he evidence currently in file indicates that her functional abilities are consistent and/or compatible with full-time sedentary work with restrictions as indicated by Dr. Leforce.  The evidence currently in file does not support a specific cognitive deficit or impairment that would impair or interfere with Ms. Warming's ability to perform the substantial and material duties of her occupation as a Secretary/Stenographer. . . .  Therefore, Ms. Warming does not meet the definition of Total Disability beyond 6/18/2006 and further benefits are not payable according to the policy.

*Id*. at 47-48.

The defendant advised: "You have exhausted all administrative remedies offered by the appeals process and the file remains closed."  *Id*. at 48.  It apprised the plaintiff of her rights to receive copies of claims file information and to bring a civil action under section 502(A) of ERISA.  *See id*.

In the wake of the appeals denial, Beal initiated several contacts with the defendant. These included:

1.     A letter dated April 13, 2007, seeking copies of documents relating to the Leforce review as well as Dr. Leforce's *curriculum vitae* and qualifications.  *See id*. at 99.  By letter

10

dated May 3, 2007, the defendant transmitted to Beal copies of the Leforce documents and stated that Dr. Leforce's *curriculum vitae* and qualifications could not be provided because they were not part of the evidence contained in the claims file.  *See id*. at 94.

2.      A letter dated March 13, 2008, seeking a copy of the plaintiff's job description, *see id*. at 91, which the defendant faxed to Beal on March 20, 2008, *see id*. at 6 & Vol. III at 614-15.

3.      A letter dated March 31, 2008, seeking verification that the policy in Beal's possession was the policy governing the plaintiff's claim, *see id*., Vol. I at 68-87, which the defendant confirmed by letter dated April 29, 2008, *see id*. at 42.

4.      A letter dated June 10, 2008, seeking reopening of the plaintiff's claim and proffering new evidence in the form of a May 14, 2008, letter from Dr. Collins that (i) summarized the results of a neuropsychological evaluation performed on February 18, 2008, by Philip Morse, Ph.D., and (ii) opined, based in part on an attached detailed description of the job of secretary/stenographer provided to Dr. Collins by Beal, that in no time in the past five years could the plaintiff perform her previous job as a secretary or even major portions of that job.  *See* Exh. 14 to Complaint.[6]  Dr. Morse's report is not attached.  *See id*.  By letter dated June 16, 2008, the defendant returned the June 10 Letter, stating that its April 10, 2007, decision was final, the plaintiff's administrative remedies provided by ERISA and the policy had been exhausted, and there were no provisions for additional appeals or reopening of the claims file

---

[6] I will also refer to Exhibit 14 in its entirety as the "June 10 Letter."  The detailed job description proffered by the plaintiff reflects that the job of secretary/stenographer requires, *inter alia*, oral comprehension, written comprehension, speech recognition, written expression, information ordering, time sharing, perceptual speed, memorization, and selective attention.  *See* Exh. 14 to Complaint at [6]-[7].

after a final appeal determination.  *See* Record, Vol. I at 41.[7]  The June 10 Letter accordingly is not of record.

The plaintiff seeks to supplement the record by adding the June 10 Letter as well as an affidavit in which she avers that the detailed list of her former job duties appended to Dr. Collins' May 14, 2008, letter describes the duties that she had to perform on a regular and substantial basis while employed as a secretary for the Muscular Dystrophy Association.  *See* Exhs. 13-14 to Complaint.

In his May 14, 2008, letter, Dr. Collins stated, *inter alia*, that:

1.  Dr. Morse's evaluation was performed "pursuant to [Dr. Collins'] discussions with Dr. Le[f]orce . . . .  As reflected in Dr. Le[f]orce's report, he and I discussed whether [the plaintiff] would be able to function in any workplace, because of her fatigue and cognitive difficulties.  With respect to the cognitive difficulties, Dr. Le[f]orce had asked whether she had undergone formal neuropsychological evaluation of her cognitive complaints.  I told him that I could arrange that evaluation in order to assist in the evaluation of her ability to work.  Dr. Le[f]orce indicated that would be helpful."  Exh. 14 to Complaint at [2].  After learning that the plaintiff's appeal had been denied, Dr. Collins discussed with her the desirability of going through with a neuropsychological evaluation.  *See id*.  An assessment was scheduled for September 2007 with Dr. Morse but was rescheduled to February 2008 because of the plaintiff's medical issues.  *See id*.

2.  Dr. Morse found substantial cognitive impairment, including overall delayed short-term memory in the first percentile for the plaintiff's age, severely impaired visual-spatial

---

[7] The record also reflects that Beal telephoned the defendant's claims personnel twice in December 2007.  *See* Record, Vol. I at 6-7.  According to the defendant's notes, Beal asked in one of those calls whether the defendant had conducted neuropsychological testing, as had been suggested by the peer reviewer (Dr. Leforce).  *See id*. at 7.  The claims examiner explained that the April 10, 2007, decision was final, and no further action had been taken on the case.  *See id*.

abilities, and a full-scale IQ of 70, well below what one would expect of someone with an associate's degree.  *See id.* at [3]-[4].

### III. Discussion

### A. Overview

The plaintiff seeks to add the June 10 Letter and her affidavit to the record on grounds that:

1.     *Orndorf* does not bar the requested supplementation, which is offered in part to bolster the plaintiff's allegation in Count II of her complaint that she was denied a full and fair review in violation of ERISA when the defendant ignored Dr. Collins' December 12, 2006, report, failed to apprise her until after its denial that Dr. Leforce had supplied information and recommendations, and refused to consider the material contained in the June 10 Letter.   *See* Motion at 8-9.  *Orndorf* recognizes the appropriateness of supplementing an administrative record in aid of procedural challenges and to add detailed job descriptions.  *See id.* at 11-13.

2.     A "bright-line temporal cut-off point" may not be applicable in any case.  *See id.* at 13.  In *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208 (11th Cir. 1997), the United States Court of Appeals for the Eleventh Circuit embraced a district court's holding that "since a defendant's duty to provide benefits is a continuing one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against the information available from time to time." *See id.* (quoting *Shannon*, 113 F.3d at 210) (citation and internal quotation marks omitted).

3.     At least two courts, the United States Court of Appeals for the Eighth Circuit in *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), and the United States District Court for the Northern District of Georgia in *White v. Reliance Standard Life Ins. Co.*, No. 1:05-CV-2149-WSD, 2007 WL 187939 (N.D. Ga. Jan. 22, 2007), have held that an ERISA claimant is deprived

of full and fair review when (i) a claimant is not provided access to a peer reviewer's report until denial of her appeal and (ii) an insurer refuses to consider materials submitted to rebut that report. *See id*. at 14-15.

4.     The defendant also failed to provide full and fair review when it relied entirely on a medical consultant who had never examined the plaintiff and refused to accept the fully-supported opinion of her treating neurologist. *See id*. at 15 (citing *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003)).

5.     The First Circuit has frowned on plan tactics that "have the effect of sandbagging claimants[,]" for example, failing to communicate a ground for denial in time for a plaintiff to effectively challenge it. *Id*. at 16-17 (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 244 (1st Cir. 2006) (citation and internal quotation marks omitted)).[8]

The plaintiff's bid to supplement the record rests on her contention that the materials proffered address in part a procedural claim, thus falling within an exception to the *Orndorf* rule against such supplementation. *See, e.g*., Motion at 7-8 ("The issue here is whether Defendant's failure to provide Plaintiff the opportunity to respond to Dr. Leforce's medical evaluation conducted after Plaintiff submitted her appeal was improper.  If such a failure is evidence of a violation of Plaintiff's right to a full and fair review, . . . the Court must permit the evidence of that failure, though not contained in the insurer's 'administrative record[,]' to be admitted into evidence.").  The defendant rejoins that the plaintiff has no legitimate claim of prejudicial

---

[8]  The plaintiff also asserts, for the first time in her reply brief, that the defendant's June 19, 2006, notice of termination of benefits violated a separate ERISA requirement that notification of termination of benefits include "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."  Reply at 5 n.5 (quoting 29 C.F.R. § 2560.503-1(g)(iii)).  This point is waived. *See, e.g., In re One Bancorp Sec. Litig*., 134 F.R.D. 4, 10 n.5 (D. Me. 1991) (court generally will not address an argument advanced for the first time in a reply memorandum).

14

procedural irregularity and, thus, no basis for the desired supplementation.  *See* Objection at 10-11.

The First Circuit has made clear that in ERISA cases, regardless of whether the standard of review is *de novo* or deferential, "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." *Orndorf*, 404 F.3d at 520 (citation and internal quotation marks omitted).  *See also, e.g., Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 10 (1st Cir. 2009) ("ERISA benefit-denial cases typically are adjudicated on the record compiled before the plan administrator.  Because full-blown discovery would reconfigure that record and distort judicial review, courts have permitted only modest, specifically targeted discovery in such cases.").

After careful review of the entire record, the proffered exhibits, and the caselaw cited by the parties, and for the reasons that follow, I conclude that the plaintiff has fallen short of meeting her burden of demonstrating the requisite very good reason for the requested supplementation.

## B.  Lack of Opportunity To Rebut Peer Review Report

The plaintiff argues, in the main, that the defendant deprived her of full and fair review when it refused to permit her to respond to Dr. Leforce's peer review report.  *See generally* Motion; Reply.  For the following reasons, I find that the defendant had no duty, consistent with full and fair review, to permit her requested rebuttal and that, hence, this asserted procedural irregularity supplies no basis for supplementation of the record.

1.     The plaintiff cites no caselaw from the First Circuit or this court holding that a plan's refusal to afford a claimant an opportunity to rebut a peer review report on which a plan relied in issuing a final appeal decision constitutes a denial of full and fair review.  Assuming

*arguendo* that a set of circumstances exists under which such conduct on the part of a plan might be said to have denied full and fair review, such a transgression cannot be said to have occurred in this case.

2.      The defendant denied the plaintiff's appeal in part on the basis of lack of objective evidence of cognitive difficulty, specifically of neuropsychological testing.  *See* Record, Vol. I at 57-58.  This was a denial based not on new evidence, but on lack of evidence.  Given that the plaintiff bore the burden of proving disability, the defendant was not required to afford her a second chance to marshal that evidence.  *See, e.g., Collins v. Metropolitan Life Ins. Co.*, 477 F. Supp.2d 274, 286 (D. Me. 2007) (rejecting claim that plan violated 29 C.F.R. § 2560.503-1(j) by, *inter alia*, proffering vague, confusing rationale that objective medical evidence was lacking; noting, "The burden is not on MetLife to show or explain how a claimant with a given condition could be disabled; rather the burden is on [the claimant] to show that she is disabled.").

3.      In any event, as the defendant points out, *see* Objection at 11, the belatedly submitted neuropsychological testing addressed the plaintiff's condition as of the date of testing in February 2008, not her condition as of the relevant time, June 16, 2006, when her benefits were terminated, *see also Orndorf*, 404 F.3d at 520 ("evidence collected after or evidence of his condition after Revere's final decision" was inadmissible); *McClenahan v. Metropolitan Life Ins. Co.*, Civil No. 08-cv-00254-REB-KMT, 2009 WL 1320918, at *1 (D. Colo. May 7, 2009) (rejecting claimant's bid to supplement record with medical record that did not exist when plan closed claimant's disability claim after terminating her benefits).[9]

---

[9] In her reply brief, the plaintiff protests that Dr. Collins did address her condition as of June 16, 2006.  *See* Reply at 6; *see also* Exh. 14 to Complaint at [5].  While Dr. Collins offered his opinion, based in part on Dr. Morse's test results, that the plaintiff was disabled as of the relevant time, there is no indication that Dr. Morse stated that her neuropsychological testing results were valid for any period earlier than the date of the testing.  *See id.* at [2]-[5].

4.      To the extent that the plaintiff implies that the defendant violated full and fair review by raising the subject of neuropsychological testing but then refusing to consider the test results that she proffered in response, *see, e.g*., Motion at 6 ("Hartford ignored this evidence [the June 10 Letter], despite the fact that it had been elicited at the suggestion of Dr. Leforce."), her point is not well-taken.  The defendant never reached any agreement with the plaintiff that it would either obtain or review such test results, and she sought no opportunity to submit such results until more than a year after the issuance of an appeal decision that the defendant had made clear it considered final.

5.      Even accepting *arguendo* the truth of Dr. Collins' version of his conversation with Dr. Leforce – that Dr. Collins offered to arrange for neuropsychological testing, whereupon Dr. Leforce commented that such testing "would be helpful[,]" Exh. 14 to Complaint at [2] – no promise was made to consider any such testing results in conjunction with the appeal.  To the contrary, the defendant's position in its official communications was that it would decide the appeal within 45 days of its letter dated March 21, 2007, and that the plaintiff's recourse then would be to file a civil suit.  *See* Record, Vol. I at 58, 115.  Neither prior to issuance of the appeal decision, nor for many months afterward, did the plaintiff seek any opportunity to submit neuropsychological testing results.[10]

6.      Nor, finally, does the plaintiff's reliance on *Abram* and *White* help her.

7.      The court in *Abram* identified two bases for its finding that "[t]he process used by the Plan was not consistent with a full and fair review":

---

[10] The plaintiff argues that she proffered the testing results with reasonable speed given that (i) she did not know of the conversation between Dr. Leforce and Dr. Collins until after denial of her appeal and (ii) she had to cancel a September 2007 appointment for neuropsychological testing because of her medical condition.  *See* Motion at 11 & n.7.  However, nothing prevented the plaintiff, who was represented by counsel, from placing the defendant on notice considerably sooner that she intended to obtain neuropsychological testing and seek reopening of the claim for consideration of those test results.  For that matter, as noted above, nothing prevented the plaintiff from obtaining neuropsychological testing prior to appealing the termination of her benefits.

> Abram was not provided access to the second report by Dr. Gedan that served as the basis for the Plan's denial of benefits until after the Plan's decision. Without knowing what "inconsistencies" the Plan was attempting to resolve or having access to the report the Plan relied on, Abram could not meaningfully participate in the appeals process. Dr. Gedan's report was solicited after the deadline for an appeals decision had passed, and was sent to Abram only after the Plan issued its final denial decision. This type of "gamesmanship" is inconsistent with full and fair review. There can hardly be a meaningful dialogue between the claimant and the Plan administrators if evidence is revealed only after a final decision.

*Abram,* 395 F.3d at 886 (citations omitted). The court in *White* followed *Abram* in holding that a claimant had been denied the full and fair review required by ERISA when plan administrators rebuffed her attempt to submit new evidence responsive to a physician reviewer's report on which they had relied in denying her appeal. *See White*, 2007 WL 187939, at *8.

8.      To the extent that the *Abram* court decried the "gamesmanship" of soliciting a peer reviewer's report without the claimant's knowledge after expiration of the deadline for issuance of an appeals decision, the instant case is distinguishable. The defendant informed the plaintiff that it would require as much as an additional 45 days to rule on her appeal in view of its decision to send her claims file to a peer reviewer, and it rendered its decision within that 45 day period. *See* Record, Vol. I at 45-48, 115.

9.      To the extent that the *Abram* court held that, consistent with full and fair review, a claimant must be afforded an opportunity to rebut a peer review report relied on by plan administrators in deciding an appeal, the court, in *Midgett v. Washington Group Int'l Long Term Disability Plan*, 561 F.3d 887 (8th Cir. 2009), subsequently abrogated that holding in view of the amendment in 2000 of the relevant regulation, 29 C.F.R. § 2560.503-1.

10.     In *Midgett*, the court agreed with the observation of the United States Court of Appeals for the Tenth Circuit in *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161 (10th Cir. 2007), that "requiring a plan administrator to grant a claimant the opportunity to review and

rebut medical opinions generated on administrative appeal 'would set up an unnecessary cycle of submission, review, re-submission, and re-review' and 'would undoubtedly prolong the appeal process, which, under the regulations, should normally be completed within 45 days.'" *Midgett*, 561 F.3d at 895 (quoting *Metzger*, 476 F.3d at 1166). The *Midgett* court added: "As noted by the Tenth Circuit, because the amendments to § 2560.503-1 did not apply to the claim in *Abram*, we 'did not consider the potential for circularity of review' in that case." *Id.* at 895-96 (quoting *Metzger*, 476 F.3d at 1167 n.3).[11]

11.     For similar reasons, the United States Court of Appeals for the Eleventh Circuit, the circuit in which the *White* court sits, embraced the reasoning of *Metzger* subsequent to the issuance of *White*. *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245-46 (11th Cir. 2008). Other courts have followed suit. *See, e.g., Balmert v. Reliance Standard Life Ins. Co.*, No. 2:07-CV-95, 2008 WL 4404299, at *9 (S.D. Ohio Sept. 23, 2008) ("Although not phrased as such by plaintiff, plaintiff's argument can be construed as one that plaintiff is entitled to a further appeal because the final decision was based on new *evidence*, as opposed to a new *reason*. That is, because Dr. Thomas' IME was the last exam to be completed, she did not have an opportunity to respond with her own evidence and thus, she should be entitled to an additional appeal. This type of argument has been rejected by the courts.") (emphasis in original); *Winz-Byone v. Metropolitan Life Ins. Co.*, No. EDCV 07-238-VAP (OPx), 2008 WL 962867, at *8 (C.D. Cal. Mar. 26, 2008) (following *Metzger*, rejecting *Abram*, in holding that claimant was not

---

[11]  Among amendments made to 29 C.F.R. § 2560.503-1 in 2000 was the addition of a requirement that plan administrators obtain evaluations from qualified health-care professionals in deciding appeals. *See Midgett*, 561 F.3d at 895; *see also* 29 C.F.R. § 2560-503-1(h)(3)(iii). The *Metzger* court observed: "If plaintiff were allowed to rebut the opinions of professionals consulted at the administrative appeal stage, then the layman claims administrator would once again be faced with the possibility of receiving new medical opinions and judgments from plaintiff's experts." *Metzger*, 476 F.3d at 1166. "Subparagraph (h)(3)(iii) specifically requires such evidence be evaluated by qualified healthcare professionals." *Id.* "Thus, if read according to plaintiff's view, the regulations set up an endless loop of opinions rendered under (h)(3)(iii), followed by rebuttal from plaintiff's experts, followed by more opinions under (h)(3)(iii), and so on." *Id.* (internal punctuation omitted).

entitled to opportunity to review and rebut reports of two peer reviewers); *Peterson v. Federal Express Corp. Long Term Disability Plan*, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *23 (D. Ariz. June 4, 2007) (same).

12.     In her reply brief, the plaintiff argues that *Abram* remains persuasive authority for purposes of this case because her claim is governed by the pre-2002 version of the relevant regulation.[12]  *See* Reply at 7.  While this argument has superficial appeal, it does not withstand close scrutiny.

First, nothing in the pre-2002 version of the regulation explicitly requires that a claimant be afforded the chance to review and rebut materials relied upon by plan administrators in rendering an adverse decision *on appeal*.  *See* 29 C.F.R. § 2560.503-1(g) & (h) (1998).

Second, the court in *Midgett* repudiated *Abram* in part on the strength of the Department of Labor's *clarification* in promulgating its 2000 amendments that claimants are entitled to access peer review materials relied on in rendering decisions on appeal only *after* such decisions are rendered.  *See Midgett*, 561 F.3d at 894; *see also* Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, 70,252 (Nov. 21, 2000); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 123 (1st Cir. 2004) (looking to post-2002 version of regulation to aid in interpreting document disclosure duties of plan administrators in case in which pre-2002 version governed; noting, "Although these regulations apply only to claims made on or after January 1, 2002, and thus do not apply to Glista's claim, the Department of Labor has made clear that the new regulations were intended to

---

[12] Although this point is made for the first time in a reply brief, a circumstance in which it normally would be considered waived, *see, e.g., In re One Bancorp*, 134 F.R.D. at 10 n.5, it joins issue on an argument raised in the defendant's opposing brief, *see* Objection at 16-18.  Hence, I have considered it.

clarify the preexisting ones and that, in its view, the preexisting regulations already contemplated disclosure of such information.") (citations omitted).

Third, as the defendant observes, *see* Objection at 17-18, cases governed by the pre-2002 regulation, such as this one, in which plans have sent a claims file to a peer reviewer in adjudicating an appeal, raise circularity of review concerns similar to those cited in connection with the amended regulation.

Finally, it is doubtful that the First Circuit, which has described "the final administrative decision" as "act[ing] as a temporal cut off point[,]" *Orndorf*, 404 F.3d at 519, would conclude that even the pre-2002 version of the regulation requires that a plaintiff be afforded a chance, *as a matter of course*, to rebut peer review materials relied upon by plan administrators in rendering a final decision on appeal. As noted above, to the extent that there are circumstances in which a reviewing court might conclude that such an opportunity should have been afforded consistent with the requirement of full and fair review, this is not such a case.[13]

## C. Reliance on Non-Examining Reviewer

The plaintiff seeks to supplement the record on the ground of a second asserted violation of full and fair review: that the defendant credited the opinion of a non-examining reviewer, Dr. Leforce, over that of a treating neurologist, Dr. Collins. *See* Motion at 15 (citing *Hawkins*, 326 F.3d at 919). *Hawkins* does not stand for the proposition for which it is cited. To the contrary, the court in *Hawkins* described the claimant's contention that the plan was required to credit the opinion of a treating source over that of a non-examining consultant as "a bad argument[.]" *Hawkins*, 326 F.3d at 916-17. More importantly, as the defendant observes, *see* Objection at 18

---

[13] *Shannon*, which the plaintiff cites for the proposition that a refusal to provide benefits is "a continuing denial, the propriety of which is measured against the information available from time to time[,]" Motion at 13 (quoting *Shannon*, 113 F.3d at 210), plainly is at odds with *Orndorf*.

n.2, the plaintiff's position is contrary to binding precedent, *see, e.g., Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 77 (1st Cir. 2006) ("[N]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians.") (citation and internal quotation marks omitted).

### D.  Omission of Job Description

The plaintiff seeks admission of her affidavit setting forth a detailed job description (Exhibit 13) not only on the ground that it is relevant to her claim of procedural violation but also on the ground that it fits an exception in *Orndorf* pursuant to which supplemental evidence "may be relevant to explain a key item, such as the duties of the claimant's position, if that was omitted from the administrative record."  Motion at 12 (quoting *Orndorf*, 404 F.3d at 520).[14]

The plaintiff's job description is not omitted from the record.  She supplied a description of her job duties when she applied for LTD benefits in 1998, *see* Record, Vol. III at 614, upon which plan administrators relied in initially granting benefits, later terminating them, and ultimately adjudicating her appeal.  From all that appears, the significantly more detailed description that she now proffers was known to her, or could have been obtained by her, prior to the defendant's decision on her appeal.  *See* Exh. 13 to Complaint.  The *Orndorf* language on which she now relies cannot be stretched to stand for the proposition that a claimant has the right to supplement the record before the court to add a more detailed and/or claimant-friendly job description when both the job description of record and the proffered job information were available to her prior to plan administrators' adverse determination of her appeal.

### E.  Alleged "Sandbagging" of Plaintiff

As a final basis for her requested supplementation of the record, the plaintiff quotes *Bard*, in which the First Circuit stated: "We have invoked our equitable and common law powers to

---

[14] I have corrected the plaintiff's misquotation of *Orndorf* as using the word "term" rather than "item."

prevent a plan from taking actions, even in good faith, which have the effect of 'sandbagging' claimants."   Motion at 16 (quoting *Bard*, 471 F.3d at 244) (footnote, citation, and internal quotation marks omitted).   In *Bard*, plan administrators failed to notify the claimant of the basis for their initial adverse benefit determination, as a result of which he was blindsided in attempting to mount an appeal.  *See Bard*, 471 F.3d at 239-40, 244-45.

In this case, by contrast, the plaintiff was informed of the basis for the initial denial, that she had not demonstrated that she continued to be disabled as of June 2006, and afforded an adequate opportunity to marshal evidence and to respond.   On appeal, she did not tender objective evidence of her asserted cognitive deficits, which she had stated as early as March 2006 contributed to her ongoing disability.   She may not have appreciated the significance of neuropsychological testing until Dr. Leforce queried whether she had undergone it and noted its absence.   Yet, the defendant's refusal to afford her another bite at the apple cannot be equated with the *Bard* plan's failure to articulate any basis whatsoever for its initial adverse decision. *See, e.g., Morales-Alejandro v. Medical Card Sys., Inc*., 486 F.3d 693, 700 (1st Cir. 2007) (rejecting claimant's argument that administrator should have conducted a functional capacity evaluation; observing that the claimant's arguments "show that he fails to understand that it is his responsibility to prove his claim").[15]

---

[15] In her reply brief, the plaintiff contends that, in denying her appeal, the defendant shifted the basis for its termination of her LTD benefits, offering for the first time the rationale of lack of objective evaluation of cognitive deficits.  *See* Reply at 5, 7 (citing, *inter alia, Glista*).  In *Glista*, plan administrators impermissibly attempted to rely, in defending against the claimant's civil suit, on a plan clause on which they had not relied during the internal review process.  *See Glista*, 378 F.3d at 128-29.  In this case, by contrast, the defendant's rationale for both its June 2006 notice of termination and its April 2007 adverse appeal decision was the same: that the plaintiff failed to meet the plan's definition of disability because the evidence did not show that she was incapable of performing the duties of her job as a secretary/stenographer.  *Compare* Record, Vol. I at 47-48 *with id*. at 54-59.  *See also, e.g., Balmert*, 2008 WL 4404299, at *9 ("Plaintiff knew the decision-maker denied her claim for lack of evidence supporting 'Total Disability,' she submitted additional evidence to rebut that reason, and the decision-maker considered the evidence along with a new IME and determined the evidence was still not sufficient.  Thus, a new reason was not offered for the final decision and plaintiff's right to an appeal was satisfied."); *Collins*, 477 F. Supp.2d at 286 ("The burden [was] not on [the defendant] to show or explain how [the plaintiff] could be disabled; rather the burden [was] on [the plaintiff] to show that she [was] disabled.").

### IV.  Conclusion

For the foregoing reasons, the Motion is **DEEMED MOOT** as to Exhibits 10 and 15 to

the Complaint, and **DENIED** as to Exhibits 13 and 14.

***SO ORDERED.***

Dated this 30th day of August, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge